IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| CAROLYN BLACKMON, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) CIVIL ACTION NO. 7:11-cv-3639-LSC |
|  | ) |
| CAROLYN W. COLVIN, | ) |
| Commissioner of Social Security, | ) |
|  | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION</u>**

The plaintiff, Carolyn Blackmon, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth, at 1239.

**STATUTORY AND REGULATORY FRAMEWORK**

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the instant case, the ALJ determined the plaintiff met the first two tests, but concluded she did not suffer from a listed impairment. The ALJ found the plaintiff was able to perform her past relevant work, and accordingly found her not disabled.

**DISCUSSION**

The plaintiff applied for disability on March 31, 2008. Subsequently, her onset date was amended to June 20, 2009, because she continued to work up until that time. Plaintiff was 34 years old on her amended onset date and alleges she is disabled due to a psychotic disorder. She does not claim to have any severe physical impairment. Record 27.

The record contains only four treatment notes for the plaintiff's mental impairment. She was seen on April 8, 2008, at the Indian Rivers Mental Health Center ("IRMHC") for an intake evaluation by a social worker. The plaintiff reported depressive symptoms and problems with paranoia. Record 253. She also reported that she saw dead people, and heard people talking she was not able to see. Id. She was diagnosed with a psychotic disorder, not otherwise specified. She was assessed a GAF score of 60.[1] Id.

On April 14, 2008, the plaintiff returned to IRMHC for a psychiatric evaluation. Her diagnosis was psychotic disorder, not otherwise specified. Record 290. She was prescribed Geodon, an antipsychotic medication. Id.

---

[1] The Global Assessment of Functioning (GAF) Scale is used to report an individual's overall level of functioning. Diagnostic and Statistical Manual of Mental Disorders 32 (4th Edition, Text Revision) ("DSM-IV-TR"). A rating of 51-60 reflects: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers.)" DSM-IV-TR at 34 (emphasis in original).

On May 21, 2008, the plaintiff returned to IRMHC reporting that her medication had reduced her symptoms somewhat, but not entirely. Record 286. At this visit she presented with a depressed mood, and Lexapro was added to her prescriptions. Id. She was diagnosed with a psychotic disorder, not otherwise specified and a depressive disorder, not otherwise specified. Id.

The plaintiff's final visit to IRMHC was November 12, 2008. It was noted she had not been seen since May. Record 285. The plaintiff reported to her counselor she was "having auditory/visual hallucinations [and] would like to restart meds now. States meds worked well for her when she was taking them." Id. The note indicates the plaintiff's psychiatrist agreed to renew her medications, but indicated they would not be refilled again if she did not keep her appointment for a psychiatric evaluation on November 20, 2008. Id. There are no further treatment notes for the plaintiffs mental impairments in the record, indicating she did not keep her appointment with her psychiatrist.

The plaintiff was referred to Dr. Gagg by the Social Security Administration for psychological evaluation on May 31, 2008. Dr. Gagg's report documents the plaintiffs lack of cooperation and malingering during the evaluation. Dr. Gagg noted the plaintiff reported that she had never worked even though documentation showed that she had been employed. Record 263. (The plaintiff's earning records show that she earned $13,489 in 2008. Record 144.) Dr. Gagg noted

the plaintiff had been diagnosed with a psychotic disorder at IRMHC. However, he commented on the lack of corroboration of plaintiff's reports by family or other sources:

> It is noteworthy, however, that (apparently) all the diagnostic impressions were based on the client's reports of symptomatology, i.e. the documentation is replete with statements where the claimant reports symptoms. However, there is no objective information in the report such as might have been gathered from collateral sources.

Record 264. Dr. Gagg also commented on the plaintiff's lack of cooperation during his evaluation:

> She was poised, but her cooperation with the evaluation was questionable. By ... way of explanation, she did not appear motivated to respond to questioning and, at several points during the interview, she appeared to be giving intentionally wrong answers.

Id.

In addition to plaintiffs lack of cooperation, Dr. Gagg observed the plaintiff "gave answers that were noted to be intentionally wrong and untenable." Id. Because of the plaintiff's apparent malingering, Dr. Gagg administered testing:

> In light of her evident malingering, she was administered the M-FAST, an instrument specifically intended to screen for malingering. It is noteworthy that the result of said malingering screening was strongly indicative of malingering. In fact, the results are consistent with very blatant malingering.

Id.

In spite of the plaintiff's lack of cooperation and malingering behavior, Dr. Gagg observed the plaintiff's "thought productivity was within normal limits and there was no evidence of delusional thought content." Record 265. Regarding the plaintiff's alleged hallucinations, Dr. Gagg remarked as follows:

> [I]t is noteworthy that [plaintiff] endorsed perceptual anomalies in all five modalities, which would be extremely rare, even in the most psychotic of individuals, which she clearly was not. Further, she responded positively to arbitrary symptoms made up by the examiner, which is further indication of malingering.

Id. Dr. Gagg found the plaintiff's mood "appeared normal." Id.

In making his diagnosis, Dr. Gagg remarked upon the difficulty created by the plaintiff's malingering:

> [T]here is some possibility of psychotic illness with this individual. *However*, given her malingering, it is difficult to tease out any legitimate psychiatric symptomatology, if indeed there are any such symptoms. Given her previous diagnosis of Psychotic Disorder, NOS (although as previously mentioned it was largely based on her self report) a diagnosis of Psychotic Disorder, NOS, by history seems appropriate.

Id. Dr. Gagg also included a formal diagnosis of Malingering. Id.

In his summary and conclusion, Dr. Gagg opined the plaintiff "was attempting to present herself as severely psychiatrically disturbed, which is very questionable, based on the quality of her responses, some of which were actually ludicrous." Id. Dr. Gagg noted the plaintiff's malingering made it difficult to assess whether she would be able to work:

> Based on this degree of malingering, it is also very difficult to assess whether or not she is appropriate for gainful employment. I simply cannot determine whether or not she will be able to manage the rigors of gainful employment, although I have no reason to believe that she would not be able to. She evidently has worked in the past, and if indeed she is receiving treatment for any *possible* psychiatric symptomatology (treatment that she states is effective), I see no reason why she would not be able to work currently.

Record 265-66. Dr. Gagg concluded his summary as follows:

> Nevertheless, she does not appear to be that psychiatrically unstable at this time and, in sum, she appears to be trying to present herself as more psychiatrically disturbed than likely is the case.

Record 266.

The only other psychological evaluation in the record was on May 11, 2009, by Dr. Blotcky, to whom the plaintiff was referred by her attorney. Dr. Blotcky's report of the mental status portion of his exam follows in its entirety:

> Ms. Blackman was appropriately attired and fairly well groomed for this evaluation. She was wearing casual clothes that were clean and neat. She did not have on makeup or jewelry. Ms. Blackman has a problem with obesity, she voiced no somatic concerns. Ms. Blackman demonstrated logical and orderly thinking. Her thought processes were extremely concrete and simplistic. Her speech was sparse. Her abstract thinking was poor. Her memory functioning was vague. It is clear to me that Ms. Blackman has a psychotic illness. She admits to auditory hallucinations and paranoia. During this exam, she was aloof, sullen, and suspicious. Ms. Blackman's judgment is deficient. Her insight is minimal.

Record 293-94. Dr. Blotcky also administered IQ testing. He reported the following scores:

| Verbal | Performance | Full Scale |
|--------|-------------|------------|
| 48     | 47          | 45         |

Record 294.

      Doctor Blotcky diagnosed the plaintiff as having a psychotic disorder, not otherwise specified, and moderate mental retardation.[2]  Dr. Blotcky assigned the plaintiff a GAF score of 26.[3]  Dr. Blotcky also completed a residual functional capacity questionnaire provided by the plaintiff's attorney on which he indicated the plaintiff had marked or extreme limitations in almost every category.  Record 296-98.

      All of the treatment notes and consultative evaluations in the record occurred prior to the time of the plaintiff's alleged onset date, as amended.  The plaintiff amended her onset date to June 20, 2009, because she continued working up until that time.  Record 155.  The plaintiff's earning records show that during 2008, while she was being treated at IRMHC and evaluated by Dr. Gagg, she earned $13,489.  Record 152.  Of this, $8,497 was reported as self employment income.  Record 152.  During the first two quarters of 2009 the plaintiff earned $5,920 in wages.  This period coincides with Dr. Blotcky's evaluation on May 11, 2009.  The

---

  [2]  Plaintiff has not raised the issue of mental retardation on appeal.

  [3]  A GAF rating of 21-30 reflects:  "**Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends.)  DSM-IV at 32 (emphasis in original).

plaintiff also reported $7,340 in self-employment income during 2009.  In amending her alleged onset date, the plaintiff alleged she has not worked since June 20, 2009.  Record 155.

After considering the evidence, the ALJ found the plaintiff had the residual functional capacity (RFC) to perform light work in a temperature controlled environment without concentrated fumes or odors.  Record 13.  The ALJ found the plaintiff had the ability to understand, remember and carry out simple instructions.  Id.  She was to have no contact with the general public.  Id.  Based upon this RFC and expert vocational testimony, the ALJ found the plaintiff could perform her past relevant work as a housekeeper.  Record 17, 42-43.

The ALJ found that the plaintiff impairments could reasonably cause her alleged symptoms.  However, he found her allegations of disabling limitations were not credible.  The ALJ also found Dr. Blotcky's residual functional capacities questionnaire was not credible.[4]  In making his credibility finding, the ALJ observed that the plaintiff "reported on multiple occasions that her psychotic and depressive symptoms improved when she was taking her medication."  Record 15.  He noted the plaintiff had made a number of false statements.  For example, he observed that the plaintiff falsely reported to Dr. Blotcky that she had never had a job even though she

---

[4] Dr. Blotcky does not qualify as a treating source under the Commissioner's regulations. 20 C.F.R. § 416.902.  However, the ALJ is still required to consider his medical opinions.  20 C.F.R. § 416.927(c).

was working at the time of his evaluation. Record 16. The ALJ also noted the plaintiff told Dr. Blotcky she had no children, when she in fact has three. Record 16. The ALJ concluded his credibility determination as follows:

> The claimant has not proven that she is disabled. As stated above, her presentation at Dr. Gagg's evaluation was such that he diagnosed malingering. He based that on his observations, evaluation and administration of a screening tool for malingering. (Ex. 8F) There are discrepancies among her presentation at Drs. Gagg, Blotcky and Indian Rivers. The conclusion is that at a minimum, claimant continues the work she was doing when she presented to each of these sources. Claimant also has recorded self-employment income from cleaning.

Record 16.

The ALJ's findings are reasonable and are supported by substantial evidence in the record. Dr. Blotcky's report indicates a level of mental impairment that is inconsistent with the plaintiff continuing ability to work during 2008 and 2009. That she was working at the time of the evaluation contradicts Dr. Blotcky's finding of extreme and marked impairments in numerous work related activities. The plaintiff was uncooperative when she was evaluated by Dr. Gagg and exhibited blatant malingering behavior, which was verified by testing. This evidence supports the ALJ's decision not to credit the plaintiff's testimony.

The plaintiff's treatment history is also inconsistent with her allegations of disabling mental impairments. When seen initially at IRMHC, the plaintiff was assessed a GAF score of 60, indicating moderate symptoms. Later treatment notes

indicate the plaintiff was improved with medication. This supports the ALJ's RFC finding of less than disabling mental symptoms. The lack of continuous mental health treatment supports the ALJ's findings. The last mental health treatment note in the record was November 12, 2008. The plaintiff's ALJ hearing was on July 22, 2010, almost two years later. There are no mental health care treatment notes during that period. Such a gap in treatment supports the ALJ's finding of a non disabling mental impairment.

## CONCLUSION

The court has carefully reviewed the entire record in this case. For the reasons set out above, the court finds the Commissioner's decision is supported by substantial evidence and that proper legal standards were applied in reaching that decision. Accordingly, the decision of the Commissioner must be affirmed.

A separate order in conformity with this memorandum opinion will be entered.

Done this 7th day of <u>August, 2013</u>.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
123966